Daniel R. Watkins
Nevada State Bar No. 11881
dw@wl-llp.com
Michael D. DiRenzo
Nevada State Bar No. 13104
R. Samuel Ehlers, Esq.
Nevada State Bar No. 9313
sehlers@wl-llp.com
WATKINS & LETOFSKY, LLP
8935 S. Pecos Rd., Ste. 22A
Henderson, NV 89074
Office:(702) 901-7553; Fax: (702) 974-1297

Attorneys for Plaintiff, Lynn Thompson

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| LYNN THOMPSON,<br><br>    Plaintiff,<br><br>vs.<br><br>TESLA MOTORS, INC; ONQGLOBAL, INC.; DOES 1-50,<br><br>    Defendants. | Case No.: 2:21-cv-00976<br><br>**COMPLAINT**<br><br>**(DEMAND FOR JURY TRIAL)** |

Plaintiff, Lynn Thompson (hereinafter "Plaintiff" or "Thompson") and files this civil action against Defendants, and each of them for violations of The Sarbanes Oxley Act, and hereby complains and alleges as follows:

## **JURISDICTION AND VENUE**

1. This Court has jurisdiction over this action under 18 U.S.C. § 1514A(b)(1)(B).

2. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343, and 42 U.S.C. §2000e-5(f)(3), which confer original jurisdiction on federal district courts in suits to address the deprivation of rights, privileges and immunities secured by the United States Constitution and federal law.

///

3. The jurisdiction of this Court is also invoked under 42 U.S.C. §§ 1981 and 1985(3), as amended by the Civil Rights Act of 1991, Pub. L. No. 102-166, and any related claims under Nevada law.

4. Supplemental Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1367 over the State law claims which are so related to the federal claims in this action that they form part of the same case or controversy under Article III of the United States Constitution.

5. Venue is proper in the District of Nevada because the unlawful employment practices alleged herein were committed in whole or in part at or near the property owned by TESLA, located at 1 Electric Avenue, Sparks, Nevada 89434 (hereinafter, " Gigafactory ") pursuant to 28 U.S.C. § 1391 (b).

6. All conditions precedent to jurisdiction under section 18 U.S.C. § 1514A, et sq., have occurred or been complied with:

   1. Plaintiff alleged his allegations and filed a complaint with the Occupational Safety and Health Administration ("OSHA") via their Whistle Blowing Program within 180 days of the violations alleged herein.

   2. Plaintiff and OSHA abided by the complaint procedures required under 29 CFR Part 190, et seq.

7. OSHA has not issued a final decision within 180 days of the filing of the Plaintiff's OSHA complaint. The delay was not due to the bad faith of the Plaintiff.

**PARTIES**

8. Plaintiff, LYNN THOMPSON, at all relevant times mentioned herein resided in Washoe County, Nevada.

9. Plaintiff is informed and believes that defendant TESLA MOTORS, INC. (hereinafter "TESLA") is a foreign corporation that at all relevant times mentioned herein was qualified to and was conducting business in Washoe County, Nevada.

10. Plaintiff is informed and believes that ONQGLOBAL, INC. (hereinafter ONQGLOBAL) is an Arizona Corporation that at all relevant times mentioned herein was qualified to and was conducting business in Nevada.

11. Plaintiff, THOMPSON, was a qualified/eligible joint employee of ONQ GLOBAL and TESLA. Both ONQ GLOBAL and TESLA shared control and codetermined the essential terms and conditions of employment for THOMPSON. Essential terms and conditions of employment include hiring, firing, pay and benefits, discipline, supervision, and direction. As "joint employers," both ONQ GLOBAL and TESLA are subject to the obligations and liabilities imposed by federal employment statutes and regulations.

12. Plaintiff worked for ONQ GLOBAL and TESLA at the TESLA Gigafactory located at 1 Electric Avenue, Sparks, NV 89434.

13. Plaintiff is ignorant of the true names and capacities, whether individual, corporate, associate, or otherwise, of DOES 1-50, inclusive. Plaintiff is informed and believes and thereon alleges that each of the fictitiously named Defendants are in some way responsible for, or participated in, or contributed to, the matters and things complained of herein, and are legally responsible in some manner. Plaintiff will seek leave to amend this Complaint when the true names, capacities, participation, and responsibilities have been ascertained.

14. Plaintiff is informed and believes, and thereon alleges, that at all times herein mentioned, the defendants named in this action, as well as the fictitiously named defendants, and each of them, were agents and employees of the remaining defendants, and in doing the things hereinafter complained of, were acting within the course and scope of such agency and/or employment and with the knowledge and consent of the remaining defendants.

**STATEMENT OF FACTS**

15. Plaintiff entered into a contract titled, "Professional Service Agreement" with ONQ GLOBAL and TESLA on or about March 22, 2018 (hereinafter "PSA") for Plaintiff to work as an Electrical Superintendent on the night shift at the TESLA Gigafactory. The PSA stated that services would start on March 19, 2018 and continue in three months increments until mutually agreed or one party provided at least 10 days written notice to the other party. Plaintiff would be paid bi-monthly at a base rate of $18,000 per month plus overtime for time worked in excess of 60 hours per week at $85 per hour.

16. Plaintiff worked as negotiated at the Gigafactory. Plaintiff's duties included investigating and reporting suspicious activity, including theft, occurring at the Gigafactory.

17. Plaintiff investigated and observed thefts occurring at the Gigafactory.

18. Plaintiff observed independent contractors on the Helix yard measuring and cutting copper wire and shipping the copper wire off site. Plaintiff was informed by TESLA and ONQ GLOBAL that theft of copper wire was occurring on site and was asked to investigate.

19. Plaintiff noticed, by his estimation, millions of dollars of copper wire being measured and cut, put onto pallets, and wrapped for delivery. These pallets were then loaded onto forklifts and subsequently onto big rigs and hauled off site. Union Contractors were then reporting theft of their copper wire, something of which that the non-union contractors were not complaining.

20. On multiple occasions, starting in April of 2018, Plaintiff reported the theft of the copper wire to Senior Management at TESLA, including but not limited to: Gustavo Herrera, Electrical Superintendent; Jack Griffin, Lead Construction Superintendent; Basile Deplante, Senior Project Manager; and Josh Bronitsky, Senior Construction Operations; and Elon Musk, CEO of TESLA. Prior to informing Senior Management at TESLA, Plaintiff also informed his own supervisor at ONQ, Mike Shutt.

21. Plaintiff requested video surveillance of the areas where the thefts were occurring, but his request was refused by Senior Management.

22. Gustavo Herrera and Josh Bronitsky initially informed Plaintiff that the activity regarding the copper wire was permitted at TESLA and to stop investigating further. Plaintiff kept reporting up the chain of command until Jack Griffin, Lead Construction Superintendent, disputed that the removal of copper wire was being permitted by TESLA. However, and unexpectedly, Senior Management changed their tune, informing Plaintiff that the copper wire was being shipped to a recycling facility and unless he catches people actually stealing copper wire red-handed, that he would be terminated for inquiring further.

23. Plaintiff also noticed while working at TESLA that the company was awarding contracts to non-union vendors (violating a 60% - 40% contract with the State of Nevada), for services worth approximately $65,000.00 to $75,000.00, at a disproportionate percentage.

24. Plaintiff further noticed that the contract amounts were significantly higher than their value, for amounts in the range of $900,000.00. Thus, TESLA was overpaying over approximately $800,000.00 per contract and was violating their agreements with the State of Nevada.

25. Plaintiff is informed and believes that on June 5, 2018, TESLA had an internal meeting that included their Corporate Executive Officer, Elon Musk; TESLA's Chief Financial Officer, Deepak Ahuja; and TESLA's Director of Global Security, Jeff Jones. During the meeting, Musk revealed that from January 1, 2018 to June 5, 2018, there was $37 million dollars' worth of unaccounted for and possibly stolen construction materials that belonged to TESLA. This included copper wire, stainless steel, machined aluminum, and other manufactured parts used in the manufacturing process for the TESLA's Model 3.

26. Plaintiff is informed and believes that the June 5, 2018 meeting specifically discussed the same copper wire that Plaintiff had witnessed being removed from the Gigafactory.

27. On or about June 6, 2018, around 11:30pm to June 7, 2018 at 12:30am, Plaintiff witnessed a few individuals loading copper wire onto a truck. Plaintiff reported the incident to TESLA security who called local law enforcement. Plaintiff requested that his report remain anonymous as he feared that certain members of management at TESLA might retaliate against him. Plaintiff was worried about TESLA management in general but was also specifically worried about Gustavo Herrera and Josh Bronitsky.

28. The Storey County Sherriff Department arrived at the scene and arrested the individuals, requiring Plaintiff to sign a witness statement. Plaintiff signed a witness statement as he personally observed the theft.

29. Around 9:00 am on June 7, 2018, Plaintiff was informed by TESLA's Senior Management that he was not permitted back at the Gigafactory. Subsequently, Mike Shutt of ONQ GLOBAL confirmed to Plaintiff that he was no longer to report to the Gigafactory. Mike Shutt told Mr. Thompson that he would move him to a new site under a new contract. Plaintiff never received a new job site from ONQ GLOBAL.

30. Since this time, Mr. Thompson has learned that TESLA and Musk pressured ONQ GLOBAL to stop allowing him on the worksite and subsequently end his work at TESLA because

of the outside reporting to law enforcement and internal reporting to Senior Management. TESLA was afraid of the information that Plaintiff learned and wanted to prevent the information from being disclosed to the media and shareholders.

31. Throughout Plaintiff's employment by TESLA and ONQ GLOBAL, he was intentionally misclassified as an independent contractor by despite the following factors which indicate that he was an employee of TESLA and ONQ GLOBAL:

1) TESLA and ONQ GLOBAL directed when, where, and how Plaintiff's work was to be done.
2) Plaintiff's immediate supervisors were all TESLA and ONQ GLOBAL employees.
3) Plaintiff could not choose subcontractors to perform work at the Gigafactory, as TESLA and ONQ GLOBAL maintained complete control over employment relationships and assignments of work.
4) TESLA and ONQ GLOBAL controlled, hired, supervised, and paid all employees, entities, subcontractors, or assistants who worked under Plaintiff.
5) Plaintiff's employment with TESLA and ONQ GLOBAL was continuous.
6) Plaintiff was bound to TESLA and ONQ GLOBAL's rules of conduct, workplace policies and codes of conduct.
7) TESLA and ONQ GLOBAL strictly directed Plaintiff's hour and days off.
8) Plaintiff worked full-time (over 60 hours per week).
9) TESLA and ONQ GLOBAL required Plaintiff to be at the Gigafactory to perform the duties of his job.
10) TESLA and ONQ GLOBAL dictated the specific order and sequence of work performed by Plaintiff.
11) Plaintiff was required to regularly report to TESLA and ONQ GLOBAL on the status of his projects.
12) Plaintiff was paid bi-monthly.

13) Plaintiff provided none of his own tools. TESLA and ONQ GLOBAL provided all tools and materials necessary for Plaintiff's work.

14) Plaintiff did not maintain his own work facilities and only worked at TESLA and ONQ GLOBAL 's facilities.

15) Plaintiff had no opportunity to realize profit or loss in relation to his employment with TESLA and ONQ GLOBAL .

16) Plaintiff only worked for TESLA and ONQ GLOBAL and was not available to any other employers.

17) TESLA and ONQ GLOBAL had unilateral control over Plaintiff's discharge.

18) Plaintiff had a unilateral right to terminate his employment without liability.

32. Plaintiff routinely worked in excess of 40 hours per week as he regularly worked the 60-hour week as set forth in his employment agreement.

## COUNT I – WHISTLEBLOWER-SARBANES OXLEY ACT
### (Against ALL DEFENDANTS and DOES 1-50)

33. Plaintiff hereby incorporates paragraphs 1 through 32 of this Complaint as though fully set forth herein.

34. Plaintiff was an employee of TESLA and ONQ GLOBAL and is a protected whistleblower under 18 U.S. Code § 1514A.

35. Plaintiff was engaged in protected activity. Specifically, Plaintiff reported misconduct and theft to his internal supervisors at TESLA and ONQ GLOBAL, including, but not limited to Gustavo Herrera, Electrical Superintendent; Jack Griffin, Lead Construction Superintendent; Basile Deplante, Senior Project Manager; and Josh Bronitsky, Senior Construction Operations (collectively, "Senior Management"); and Elon Musk, CEO of TESLA. Prior to informing Senior Management at TESLA, Plaintiff also informed his own supervisor at ONQ GLOBAL, Mike Shutt. He also reported the conduct to the County Sheriff.

36. Plaintiff requested video surveillance of the areas where the thefts were occurring, but his request was refused by Senior Management for Defendants.

37. Gustavo Herrera and Josh Bronitsky initially informed Plaintiff that the activity regarding the copper wire was permitted at TESLA and to stop investigating further. Plaintiff kept reporting up the chain of command until Jack Griffin, Lead Construction Superintendent, disputed that the removal of copper wire was being permitted by TESLA. However, and unexpectedly, Senior Management changed their tune, informing Plaintiff that the copper wire was being shipped to a recycling facility and unless he catches people actually stealing copper wire red-handed, that he would be terminated for inquiring further.

38. The TESLA and ONQ GLOBAL knew that Plaintiff was engaged in protected activity when he reported misconduct and theft to his TESLA Supervisors, his ONQ supervisor, and the County Sheriff.

39. Plaintiff was terminated from TESLA and ONQ GLOBAL because of his reporting of misconduct and theft to his TESLA Supervisors, his ONQ supervisor, and the County Sheriff.

40. The misconduct Plaintiff reported includes, but is not limited to, the intentional cover-up of significant material thefts at the Gigafactory by TESLA, unlawful violations of contracts with the State of Nevada and unions, and TESLA and ONQ GLOBAL's active concealment and participation in unlawful conduct.

41. Plaintiff reasonably believes the misconduct alleged in these pleadings constitute violations of federal criminal law provisions prohibiting mail, wire or bank fraud, rules and regulations of the SEC, or provisions of federal law relating to fraud against shareholders.

42. Plaintiff was terminated by TESLA and ONQ GLOBAL after he reported the misconduct to his TESLA and ONQ GLOBAL Supervisors and to County Sheriff.

43. Plaintiff was subjected to the adverse employment action described herein because of his participation in the protected activity and adverse employment action would not have occurred but for that participation.

44. As a direct and proximate result of TESLA and ONQ GLOBAL'S willful, knowing, and intentional retaliation against Plaintiff, Plaintiff has suffered and will continue to suffer anxiety, embarrassment, suffering, pain, humiliation, and emotional distress.

//

45. Plaintiff's investigation of and reporting of the misconduct was a substantial contributing factor to the termination of his employment.

46. Plaintiff has also suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities. Plaintiff is thereby entitled to general and compensatory damages in amounts to be proven at trial.

47. Defendants' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiff's federally protected rights.

48. Plaintiff requests relief as described in the Prayer for Relief below.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court grant the following relief:

1. Economic Losses, plus prejudgment interest;
2. Compensatory Damages accordance with 18 U.S.C. § 1514A(c)(2), 42 U.S.C. § 1983 and other applicable statutes and law:
3. Reasonable attorney's fees;
4. Punitive damages;
5. Cost of suit incurred herein; and
6. Such other and further relief as the court deems just and proper.

DATED this 21st day of May 2021.	WATKINS & LETOFSKY, LLP

*/s/ Daniel Watkins*

By: _____
Daniel R. Watkins, Esq.
Michael DiRenzo, Esq.
R. Samuel Ehlers, Esq.
8935 S. Pecos, Ste. 22A
Henderson, NV 89074
Attorneys for Plaintiff, Lynn Thompson

## REQUEST FOR JURY TRIAL

Pursuant to Federal Rules of Civil Procedure 38(b) and 42 U.S.C. §1981a, Plaintiff demands a trial by jury in this action on all issues so triable.

DATED this 21st day of May 2021

WATKINS & LETOFSKY, LLP

*/s/ Daniel Watkins*

By: _____
Daniel R. Watkins, Esq.
Michael DiRenzo, Esq.
R. Samuel Ehlers, Esq.
8935 S. Pecos, Ste. 22A
Henderson, NV 89074
Attorneys for Plaintiff, Lynn Thompson